UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONDALEE MORRIS,<br><br>Plaintiff,<br><br>v.<br><br>G. MODHADDAM, et al.,<br><br>Defendants. | No. 2: 18-cv-2850 MCE KJN P<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on plaintiff's second amended complaint filed May 14, 2019, against defendants Dr. Modhaddam, Dr. Bishop and Dr. Tesluk, as to plaintiff's claim that these defendants violated plaintiff's Eighth Amendment right to adequate medical care by denying plaintiff's requests to adjust his glaucoma medications to alleviate side effects of headaches, eye pain, nausea and blurred vision. (ECF Nos. 15 (second amended complaint), 28 (service order setting forth claims on which this action proceeds).)

Each defendant is represented by separate counsel.

Pending before the court are motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by defendants Tesluk and Bishop. (ECF Nos. 41, 64.) Also pending are summary judgment motions filed by defendants Tesluk and Bishop. (ECF

1

Nos. 78, 85.) For the reasons stated herein, the undersigned recommends that the pending summary judgment motions be granted. Based on this recommendation, the motions to dismiss are vacated.

Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on October 26, 2020 (ECF No. 60), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

Plaintiff's Claims

The undersigned sets forth the allegations in the second amended complaint against defendants Bishop and Tesluk. (ECF No. 15.) Plaintiff alleges that defendant Bishop is employed as a medical doctor at the Cedar Eye Center in Placerville, California. (Id. at 3.) Plaintiff alleges that defendant Tesluk is a medical doctor employed at the Surgery Center in Modesto, California. (Id.)

Plaintiff alleges that he suffers from glaucoma. (Id. at 7.) Plaintiff alleges that defendants Bishop and Tesluk denied his requests to adjust his glaucoma medication to alleviate the side effects of the medication. (Id. at 9.) Plaintiff describes the side effects of his glaucoma medication as nausea, eye pain, headaches and blurred vision. (Id.)

Plaintiff also alleges that he refused defendants' recommendation for eye surgery on his left eye. (Id.) Plaintiff alleges that the surgery would only reduce his eye pressure and not his eye pain. (Id.) Plaintiff alleges that even after surgery, he would still require medication. (Id.)

Plaintiff alleges that defendant Bishop examined him on December 5, 2016, and August 8, 2017. (Id. at 10.) On December 5, 2016, defendant Bishop recommended surgery. (Id.) Defendant Bishop also recommended that plaintiff continue "maximum meds." (Id.)

On August 8, 2017, plaintiff complained to defendant Bishop about the side effects of his medication, including nausea. (Id.) Defendant Bishop again recommended surgery and that plaintiff "continue maximum meds." (Id. at 11.)

On September 25, 2017, defendant Tesluk examined plaintiff. (Id.) Plaintiff complained about the side effects of his medication, including nausea and headaches. (Id.) Plaintiff declined

4

defendant Tesluk's recommendation for surgery.  (Id.)  Defendant Tesluk recommended that plaintiff continue his "current eyedrops" and return in three months for a follow-up visit.  (Id. at 12.)

Legal Standard for Eighth Amendment Claim

The Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  To state a claim a plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096).  "Deliberate indifference is a high legal standard," Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted).

"Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)).

Further, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)).  Rather, a plaintiff is required to show that the course of treatment selected was "medically unacceptable under the circumstances" and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health."  Snow, 681 F.3d at 988 (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

////

<u>Motion for Summary Judgment by Defendant Bishop</u>

In his summary judgment motion, defendant Bishop identifies plaintiff as a pretrial detainee and analyzes plaintiff's claims under the Fourteenth Amendment. It appears that at all relevant times, plaintiff was a convicted prisoner.[1] For this reason, plaintiff's claims are evaluated under the legal standards set forth above for claims alleging inadequate medical care in violation of the Eighth Amendment.

The undersigned also clarifies that the evidence demonstrates that at all relevant times, defendant Bishop was employed as a medical doctor at the Cedar Eye Center in Placerville, California. (ECF No. 78-2 at 4, 7.) Defendant Bishop's reports indicate that plaintiff's primary care physician at California State Prison-Sacramento ("CSP-Sac") referred plaintiff to defendant Bishop for treatment of glaucoma. (<u>Id.</u>)

Defendant Bishop moves for summary judgment on the grounds that his failure to adjust plaintiff's medications following his December 5, 2016, and August 18, 2017 examinations of plaintiff fell within the standard of care. Defendant Bishop filed a statement of undisputed facts that is largely based on the declaration of his expert, Dr. Chang. (ECF Nos. 78-1, 78-2.) The undersigned sets forth Dr. Chang's declaration herein:

> 1. I am a physician licensed to practice in the State of California. I obtained my medical degree from the University of Missouri, Kansas City School of Medicine in 2002. In 2003, I completed a post-doctoral research fellowship in Optical Coherence Tomography at the Bascom Palmer Eye Institute. In 2004, I completed an internship at the Evanston Northwestern Hospital. From 2004 to 2007, I completed a residency in ophthalmology in Washington University St. Louis. In 2009, I completed a fellowship at the University of Miami, Bascom Palmer Eye Institute. From 2009 to 2020, I was an assistant professor of ophthalmology at Stanford University. From 2020 to present, I have been an associate professor of ophthalmology at Stanford University. I am a fellow in the American Academy of Ophthalmology. For a more complete outline of credentials, a true and correct copy of my curriculum vitae is attached hereto as Exhibit A.
>
> 2. I am familiar with the standard of care for physicians who practice in the field of ophthalmology. I have cared for thousands

---

[1] The order directing service on defendants directed this action to proceed on plaintiff's Eighth Amendment claim. (ECF No. 28 at 1.)

of patients with glaucoma. I was asked to comment on the standard of care with respect to Dr. Douglas Bishop's care and treatment of Condalee Morris. I was also asked to comment on whether any act or omission by Dr. Bishop was a substantial factor in causing Mr. Morris' alleged harm.

3. In preparation for my evaluation of the issues in this case, I have reviewed Mr. Morris' records from Cedar Eye Center Medical Group. My review of the materials revealed the following:

   A. On December 5, 2016, Dr. Bishop saw Mr. Morris who was 40 years of age at the time. His chief complaint was for a glaucoma followup. He was compliant with drops in both eyes. He has last instilled drops on the morning of this visit. He presented for an intraocular pressure (IOP) check. He had a prior history of glaucoma in the left eye, myopia and an astigmatism.

   B. At the time of the visit, Mr. Morris was using brimonidine, dorzolamide, latanoprost and timolol maleate. An eye examination was performed. He had no light perception (NLP) in his right eye. The left eye was 20/80. The right IOP as 27 and 29 when checked twice. The left IOP was 25 and 27. He was noted to have a defect in both eyes. Dr. Bishop's impressions were severe glaucoma in both eyes, myopia of the left eye, and a regular astigmatism. His plan was to continue with the medications as prescribed since Mr. Morris was already on the maximum topical therapy, an OCT and to return in 3 to 4 weeks for an IOP check and an OCT. Dr. Bishop also recommended a surgical intervention (a trabeculectomy) of the left eye which was the only seeing eye.

   C. Approximately eight months later, on August 18, 2017, Dr. Bishop saw Mr. Morris for a followup visit regarding his high IOP and surgical recommendation. Mr. Morris stated he was compliant with the drops, but he was having side effects. He had nausea after using brimonidine and occasionally had headaches. He felt he was not getting proper care. He wanted to discuss a trabeculectomy which was mentioned at the last visit. Dr. Bishop performed a physical examination and noted the left IOP was 19 and the right IOP was 15. Dr. Bishop again recommended surgical treatment. He said if Mr. Morris did not get surgical treatment, he would lose vision in his left eye. He recommended using the medication. Dr. Bishop referred Mr. Morris to a glaucoma specialist to consider surgical treatment to lower the pressure. Dr. Bishop stressed the importance of following through with his recommendations as Mr. Morris had failed to follow through with the previous surgical recommendations. In the meantime, Mr. Morris was told to utilize the drops as prescribed.

4. I have considered Mr. Morris' allegations that Dr. Bishop was negligent and refused to adjust medications to alleviate side effects of headaches, eye pain, nausea and blurred vision. I have also considered the allegations that Dr. Bishop's acts or omissions were a substantial factor in causing Mr. Morris' alleged harm. Based upon my review of the records, my knowledge, education, training and experience, it is my opinion that Dr. Bishop was within the standard of care at all times. In other words, Dr. Bishop was not negligent and did not fall below the standard of care in his care and treatment of Mr. Morris. In addition, I am also of the opinion that no act or omission by Dr. Bishop was a substantial factor in causing Mr. Morris' alleged harm.

   5. I base my opinions on the information I have reviewed in this case, my education, my training and many years of experience and the following:

      A. During the initial visit, Dr. Bishop examined Mr. Morris and noted he had an uncontrolled IOP. Mr. Morris complained of headaches and dry eye, which are common complaints with glaucoma drops. Dr. Bishop appropriately managed the medications and recommended a trabeculectomy and told Mr. Morris to return in three to four weeks. The management and recommendation appear to be done to control the high IOP and the side effects from the medications that Mr. Morris complained of.

      B. Mr. Morris did not return to Dr. Bishop's office for eight months. Dr. Bishop noted the IOP had come down and again told Mr. Morris to see a surgeon regarding the trabeculectomy. Mr. Morris did not return after that visit. At that point, Dr. Bishop did not need to readjust the medications as it was appropriate to refer Mr. Morris to a surgeon for further care.

(ECF No. 78-2 at 14-17.)

Plaintiff filed a one-page opposition to Bishop's summary judgment motion. (ECF No. 90.) In his unverified opposition, plaintiff states that eight months after the first visit, plaintiff saw defendant Bishop on August 18, 2017 for a follow-up visit regarding his high IOP and surgical recommendation. (Id. at 1.) Plaintiff stated that he was having side effects including nausea and headaches. (Id.) Plaintiff wanted to discuss a trabeculectomy. (Id.) Plaintiff and defendant Bishop discussed readjusting the medication due to the side effects. (Id.)

The undersigned finds that plaintiff's unverified opposition contains no admissible evidence.

8

Based on Dr. Chang's unopposed expert opinion, set forth in the declaration above, the undersigned does not find that defendant Bishop acted with deliberate indifference when he failed to adjust plaintiff's eyedrop medications following the December 5, 2016, and August 18, 2017 examinations based on plaintiff's complaints of side effects. In his declaration, Dr. Chang opines that following the December 5, 2016 examination, defendant Bishop acted within the standard of care by recommending a trabeculectomy, telling plaintiff to return in three to four weeks and maintaining plaintiff's medications because plaintiff's IOP was uncontrolled and plaintiff presented common complaints regarding the side effects of the glaucoma drops.[2] Dr. Chang opines that defendant Bishop acted within the standard of care on August 18, 2017, when he referred plaintiff to a surgeon and maintained plaintiff's medications.[3] Dr. Chang indicates that defendant Bishop acted within the standard of care when he determined that the surgeon should decide whether plaintiff's medications should be adjusted. The undersigned also observes that there is no evidence in the record that plaintiff's side effects were particularly severe.

Dr. Chang does not directly address whether defendant Bishop could have treated plaintiff's side effects from the eyedrops, i.e., headaches and nausea, other than by reducing the dosage of the eyedrops. However, assuming that defendant Bishop could have prescribed some medication to treat the side effects, the undersigned does not find defendant Bishop's failure to prescribe medication to treat the side effects on the two occasions he examined plaintiff amounted to deliberate indifference.[4] See Toussaint v. McCarthy, 801 F.2d 1080, 1112 (9th Cir. 1986),

---

[2] In his declaration, Dr. Chang states that plaintiff was 40 years old at the time of defendant Bishop's examination of plaintiff. In a letter dated September 25, 2017, defendant Tesluk states that plaintiff was 52 years old on the date of his examination of plaintiff. (ECF No. 85-5 at 15.) The undersigned cannot determine plaintiff's age during the relevant time because plaintiff's date of birth is blacked out on the medical records submitted by both defendants. However, the differences in plaintiff's age reported in Dr. Chang's declaration and defendant Tesluk's letter is not material.

[3] Plaintiff does not claim, nor is there any evidence in the record, that defendant Bishop had any role in the delay in plaintiff's return for a follow-up visit following the December 5, 2016 examination.

[4] In the original and first amended complaints, plaintiff alleged that defendants denied his request for medical marijuana to treat pain and nausea caused by the medications he took to treat

abrogated on other grounds by Sandin v. Conner, 515 U.S. 472, 482-83 (1995) ("Plaintiff's citation to isolated occurrences of neglect do not amount to a constitutional violation."); O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) ("Plaintiff alleges that defendants exhibited deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments by repeatedly failing to satisfy his requests for aspirins and antacids to alleviate his 'headaches, nausea and pains.' [Footnote omitted.] Such isolated occurrences of neglect do not amount to a constitutional violation.").

For the reasons discussed above, the undersigned recommends that defendant Bishop's summary judgment motion be granted.

Motion for Summary Judgment by Defendant Tesluk

Defendant Tesluk moves for summary judgment on the grounds that he did not act with deliberate indifference to plaintiff's serious medical needs when he failed to adjust plaintiff's medications following the September 25, 2017 examination. At the outset, the undersigned observes that the evidence demonstrates that at all relevant times, defendant Tesluk was employed as a medical doctor at the Modesto Eye Surgery Medical Group in Modesto, California. (ECF No. 85-5 at 15.) The evidence demonstrates that Dr. Chaiken at CSP-Sac referred plaintiff to defendant Tesluk for a consultation regarding plaintiff's glaucoma, likely based on defendant Bishop's recommendation that plaintiff consult with a surgeon. (Id.)

Defendant Bishop filed a statement of undisputed facts that is largely based on the declaration of his expert, Dr. Stamper. (ECF Nos. 85-2, 85-4.) The undersigned herein sets forth Dr. Stamper's declaration in relevant part, noting that Dr. Stamper's education and experience are set forth in paragraphs 1-7 of his declaration. (ECF No. 85-4 at 1-4.)

> 9. Based on my review of the pertinent medical records, and other documents mentioned above relating to the care and treatment Condalee Morris received from Dr. Tesluk on September 25, 2017, I understand the pertinent medical chronology to be as follows:

---

glaucoma. (See ECF No. 13 at 1.) The court dismissed this claim on the grounds that the failure to provide medical marijuana to a prisoner does not state an Eighth Amendment claim. (ECF Nos. 13, 16.) In the second amended complaint, plaintiff's claim that defendants failed to "treat" the side effects from his eyedrops may be an attempt to reallege this previously dismissed claim.

10

A. On September 25, 2017, Condalee Morris presented at the office of Dr. Tesluk for evaluation of his glaucoma. Mr. Morris gave an 8 year history of glaucoma, and explained that he had previous laser trabeculoplasty on two or three separate occasions. Mr. Morris also reported that he lost vision in his right eye in 2012, and complained of headaches, blurred vision, eye soreness, floaters and redness in his eyes. At the time of his visit, Mr. Morris was administering latanoprost eyedrops one time per day in both eyes, and dorzolamide, brimonidine, and timolol eyedrops three times a day in both eyes to control his glaucoma. The medical chart notes that Mr. Morris complained of side effects from his eyedrop medications including nausea and headaches.

B. On examination, the visual acuity was noted in Mr. Morris' medical chart as no light perception in the right eye, and 20/40 in the left eye. The medical chart further notes that the eye pressures were 17 in each eye. Mr. Morris stated that his goal was to keep his eye pressures at 14 or below. The slit-lam exam showed a 1-2+ nuclear sclerotic cataract in each eye. Ophthalmoscopy showed severe optic disc cupping with a cup-to-disk ratio of 0.95 in the right eye and 0.9 in the left eye. Dr. Tesluk's charted impression was advanced glaucoma in the left eye and blindness in the right eye. Dr. Tesluk recommended that Mr. Morris undergo a trabeculotomy with implantation of an aqueous shunt to lower the eye pressure in the left eye. However, Mr. Morris refused to undergo the surgical intervention recommended by Dr. Tesluk. The plan was for Mr. Morris to continue with his eyedrop medications as prescribed since he was already on the maximum topical therapy, and return for a follow-up visit in three months with optic disc photography or earlier if Mr. Morris reconsidered his decision on surgery.

10. It is my understanding that Mr. Morris is claiming that Dr. Tesluk was deliberately indifferent to his serious medical needs in violation of his Civil Rights under the Eighth Amendment. Specifically, I understand Mr. Morris is claiming that Dr. Tesluk refused to adjust his eyedrop medications to alleviate side effects of headaches and nausea, and failed to respond to his complaints of pain. I have also considered Mr. Morris' claim that Dr. Tesluk's acts or omissions to act caused him damages in this case.

11. Based on my review of the pertinent medical records and other documents and evidence relating to Condalee Morris during his care and treatment by Dr. Tesluk, as well as upon the entirety of my education, background, training and years of experience as an Ophthalmologist and glaucoma specialist, it is my professional medical opinion that all of the care and treatment Mr. Morris received from Dr. Tesluk in connection with the September 25, 2017 ophthalmic consultation concerning Mr. Morris' glaucoma, met the applicable standard of care for an Ophthalmologist practicing under like circumstances, and there were no negligent acts or omissions to act on the part of Dr. Tesluk which were a cause of damages to Mr. Morris.

12. The care and treatment provided to Mr. Morris by Dr. Tesluk in connection with his glaucoma consultation and subsequent

recommendation that he continue with his eyedrop medications as prescribed since Mr. Morris refused to undergo a glaucoma operation to lower the eye pressure in the left eye, met the standard of care in every particular. In fact, at the time of his visit with Dr. Tesluk, Mr. Morris was already on the maximum amount of eyedrop medications to control his eye pressures, and will likely continue to suffer further vision loss in his left eye without the glaucoma surgery recommended by Dr. Tesluk.

13. In September of 2017, when Mr. Morris visited Dr. Tesluk for an ophthalmic consultation, he presented with an eight year history of glaucoma which had already claimed the vision in his right eye. Mr. Morris had complaints of headaches, blurred vision, eye soreness, floaters and redness in his eyes, and side effects of nausea and headaches from his eyedrop medications. Mr. Morris underwent several laser trabeculoplasty procedures in the past to control his eye pressures, and was on the maximum amount of eyedrop medications to control his eye pressures. His visual acuity was measured as 20/40 in the left eye, and his eye pressures were 17 which were above his stated goal of keeping his eye pressure at 14. Ophthalmoscopy showed severe optic disc cupping with a cup-to-disk ratio of 0.95 in the right eye and 0.9 in the left eye. Mr. Morris' glaucoma was not adequately controlled with eyedrops, and Dr. Tesluk's recommendation that Mr. Morris undergo a trabeculotomy with implantation of an aqueous shunt was intended to lower the intraocular pressure in each eye and probably reduce his topical medication burden. At the time of his presentation to Dr. Tesluk, Mr. Morris was exhibiting a significant compromise in ocular health secondary to the complication of his glaucoma and resulting blindness in one eye and a significant risk of developing blindness in the other eye without more aggressive treatment to address the glaucoma. Given Mr. Morris' clinical presentation, Dr. Tesluk's recommendation of a trabeculotomy with implantation of an aqueous shunt in each eye, was entirely appropriate and not only met the applicable standard of care but based on Mr. Morris' lack of control of his glaucoma with the maximum doses of eye drops, if he wished to preserve his remaining vision in his only functioning eye, surgery was his best alternative.

14. When Mr. Morris refused to undergo a trabeculotomy to lower the eye pressures in his eyes, Dr. Tesluk's recommendation that Mr. Morris continue with his eyedrop medications as prescribed since he was already on the maximum topical therapy, and to return for a follow-up visit in three months with optic disc photography or earlier if Mr. Morris reconsidered his decision on surgery, was entirely appropriate and met the applicable standard of care. At the time Mr. Morris visited Dr. Tesluk for a glaucoma consultation, he had already undergone selective laser trabeculoplasty on three separate occasions (and, therefore, was unlikely to benefit from further laser therapy), was on the maximum amount of eyedrop medications, lost all the vision in his right eye, and presented with advanced stage glaucoma in his left eye. In my experience, one of the surgeries which has the most effectiveness in achieving a lasting lowering of the eye pressure is the implantation of an aqueous shunt. However, Mr. Morris refused to undergo the recommended glaucoma surgery. Thus,

12

reducing or adjusting the amount of eyedrop medications prescribed to Mr. Morris, which was the maximum topical therapy, would cause his eye pressures to rise and likely cause further vision loss or total blindness in his left eye. Given the refusal to undergo surgery, the recommendation to continue on the maximum dose of medications was appropriate in order to attempt to address the elevated pressures which were placing Mr. Morris' remaining vision at risk. It would not have been reasonable from a treatment perspective to recommend that Mr. Morris stop taking his medication as that was the only treatment option remaining in light of his refusal to undergo surgery. Further, just as Mr. Morris rejected the recommendation for surgery, he was free to make his own decision on whether or not to take the recommended medications.

15. It is my further opinion that, to a reasonable medical probability, there was no negligent act or omission to act on the part of Dr. Tesluk which caused Mr. Morris any damages in this case. My review of Mr. Morris' medical records and other pertinent documents demonstrates that Mr. Morris' eye pressure was never elevated enough to engender the type of pain he complained of during his visit with Dr. Tesluk. The highest intraocular pressure recorded in Mr. Morris' medical record was in the low thirties, which is usually not symptomatic at that level. Blurred vision is a common symptom in patients with advanced stage glaucoma like Mr. Morris. Headaches and eye redness are common side effects from glaucoma eyedrop medications with nausea a less common but possible side effect. Floaters are a common accompaniment of normal ageing and are usually not indicative of a disease state. If Mr. Morris wanted to reduce any side-effects from the use of the eyedrop medications, Dr. Tesluk offered Mr. Morris the best alternative at that time which was glaucoma surgery. There is no evidence in the medical records indicating Mr. Morris suffered severe pain or a serious medical problem in his eyes as a result of the eyedrop medications. Rather, his documented complaints were consistent with his underlying eye pathology, and necessary prior surgical intervention. All of the care and treatment provided by Dr. Tesluk was appropriate and reasonable with appropriate evaluation, reporting and recommended follow-up.

16. In summary, my review of the medical records and other documents in this matter, along with my education, training and experience as an Ophthalmologist, has led me to conclude that, to a reasonable medical probability, the care and treatment Mr. Morris received from Dr. Tesluk in connection with Mr. Morris' glaucoma consultation on September 25, 2017, met the applicable standard of care for an Ophthalmologist practicing in like circumstances and further, there were no acts or omissions to act on the part of Dr. Tesluk which were the cause of any damages to Mr. Morris.

(ECF No. 85-4 at 4-8.)

Plaintiff filed a one-page opposition to Tesluk's summary judgment motion. (ECF No. 89.) In his unverified opposition, plaintiff describes the September 25, 2017 examination by

13

defendant Tesluk, which is consistent with Dr. Stamper's description of the examination. Plaintiff's states that on September 25, 2017, he saw defendant Tesluk for an evaluation of his glaucoma. (Id. at 1.) Plaintiff states that the medical chart notes that plaintiff complained of side effects from his eyedrop medication including nausea and headaches. (Id.) Plaintiff then writes, "we discuss as well readjust the medication due to I suffer side effect." (Id.)

The undersigned finds that plaintiff's unverified opposition contains no admissible evidence.

Based on Dr. Stamper's unopposed expert opinion, set forth in the declaration above, the undersigned does not find that defendant Tesluk acted with deliberate indifference when he failed to adjust plaintiff's eyedrop medication following the September 25, 2017 examination based on plaintiff's complaints of side effects. According to Dr. Stamper, reducing the eyedrop medication would cause plaintiff to suffer further vision loss or total blindness. Based on plaintiff's refusal of surgery, Dr. Stamper opines that defendant Tesluk acted appropriately in continuing plaintiff's eyedrops at the maximum dose. The undersigned also observes that there is no evidence in the record that plaintiff's alleged side effects were particularly severe.

Dr. Stamper does not directly address whether defendant Tesluk could have treated plaintiff's alleged side effects, i.e., headaches and nausea, other than by reducing the dosage of the eyedrops. However, assuming that defendant Tesluk could have prescribed some medication to treat the side effects, the undersigned does not find defendant Tesluk's failure to prescribe medication to treat the side effects on the one occasion he examined plaintiff amounted to deliberate indifference. See Toussaint v. McCarthy, supra; O'Loughlin v. Doe, supra.

For the reasons discussed above, the undersigned recommends that defendant Tesluk be granted summary judgment.

Accordingly, IT IS HEREBY ORDERED that the pending motions to dismiss (ECF Nos. 41, 64) are vacated; and

IT IS HEREBY RECOMMENDED that:

1. Defendant Bishop's motion for summary judgment (ECF No. 78) be granted; and

2. Defendant Tesluk's motion for summary judgment (ECF No. 85) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 6, 2021

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Mo2850.sj